Ray v. International Paper Company. Mr. Murphy. Good to see you, Mr. Murphy. Thank you, Your Honor, and may it please the Court, my name is Brian Murphy. I have the honor of representing Tomika Ray before you. Also with me this morning who will be addressing the Court is Mr. Paul Ramshaw from the Equal Employment Opportunity Commission. Your Honor, this is a case about repeated, reported, and corroborated sexual harassment and retaliation. There were two claims, one for sexual harassment and one for retaliation. The problem is that when she told him about it the first time, she told him, and this happens all the time in an employment context, I don't want to cause any trouble, I'm just the obligation of the employer to stop it, does it? Your Honor, I think it would, one that would depend on the circumstance, but that comment was just made as to the first time. The record is replete with other instances where she complained after that. The record's a mess in this case, and as near as I can tell, she went to Israel and Owens and Smith after 10 years of putting up with this and told them not to say anything. Then she went to at least Owens and Smith again and complained, but the record doesn't say whether she said keep this under wraps or not, does it? No, it doesn't, Your Honor. And then finally she goes and tells somebody from HR, and the HR department hopped on things pretty quickly. Relatively quickly. They sent some people down to interview McDowell and check out this business about him saying improper things and so forth, didn't they? First of all, Your Honor, that wasn't the final, and second of all, hopped on it, it's an interesting term because what they did was they corroborated and then ignored the corroboration. Well, they may not have addressed it promptly, but didn't they go down and interview McDowell and other people as soon as she complained to the HR folks? That was in September of 14. Absolutely, Your Honor, and what they did was critical to our case. And they went and they talked to, Reeves and Hyatt went down and talked to three folks and reported that McDowell told them, the other three employers confirmed that McDowell told them he wanted to have sex with Ray, and they didn't take action against him. But should she be able to recover for all the harassment that occurred up to that point? It's clear she should be able to recover for the harassment that was occurring during the time that she was reporting to her supervisor. Under their policy, Your Honor, once her supervisor, she goes to the harassment, they are obligated under the policy, and I would submit by law, to take that to the appropriate management and have it acted upon. Now, I understand the point with when she tells them, and I think you made an astute observation, that this is very common in these circumstances, because it is. I deal with this a lot. Victims are often very nervous and worried about what's going to happen. They're intimidated, and for good reason. He brought her in one-on-one and threatened her. So, yes, she's intimidated. She has very good reason to be intimidated. And then when she did complain, to the point that HR came in, we have six different coworkers on the floor who were courageous enough to corroborate what was going on in the September, the November, and the June 2015 complaints. Six different people corroborated it, and they dismissed all that. They determined that they didn't even consider that. Well, and clearly, before she went to HR, somebody had approached McDowell from management, because in early 2014, McDowell called Ray into his office and said, have you reported me for harassment? You could get me in a peck of trouble. And then, sometime right after that, in the spring of 2014, he cuts his overtime. Cuts her overtime. What makes it an unusual case, to me, is that the same conduct constitutes retaliation and harassment in some portions of this case. It can constitute the tangible employment action for purposes of not applying the Elrath-Farragut offense and the adverse employment action, and that's not that uncommon. The standard for tangible employment action and adverse employment action are somewhat different. It's much easier under adverse employment action under Burlington Northern, but they can be the same, and the cutting of overtime happens to be one of those, when it has the result of a significant decrease in pay, it can be one of those things that can be both. What you've got to support the claim of retaliation is that he cuts her overtime, and then at some time in 2014, this is after this event in early 2014, where he asks her whether she has reported him. After that, he cuts her overtime, and then he starts to sabotage her work by fouling up the production line, which I guess is like a... I can't explain that. And he stares at her, whether in a dazed or lustful way is anybody's guess, but he stares at her, which she doesn't like. And then the question is whether that would be something that would meet the relaxed standard of an action that constitutes retaliation. I think on the last two, that was the issue. The harassment and sabotage, the district court found that didn't constitute an adverse employment action by citing the Boone versus Gooden case, which we, of course, pointed out has been supplanted by the Burlington Northern as recognized by when the district courts. I don't think there was any dispute that the other form of harassment, the other form of retaliation, which occurred earlier, which is the cutting of overtime, that was a different time frame. Was that supported by the records? Yes, sir. Cutting the overtime? Yeah, yeah, yeah. And let me talk about that, because they keep briefing that, and the district court bid on that, and they submitted evidence. What we are talking about is daily overtime, the ability to come in four hours early for your 12-hour shift. I told them what you're doing, explain what you mean by cutting the overtime. What they pointed to, what we said, was in 2014, he cut that daily overtime, which was significant. When in 2014? About the same time that he confronts her. About the same time or afterwards? We don't have absolute ... Well, I thought Judge Gibney set it up for you that it would happen after you met with her. He supported the joint appendix. And you said yes, but now you're backing off. The sequence I'm talking about. Right. Was it after he met with her one-on-one? You call it the spring of 2014. It's the best I can do, yeah. But then you say early 2014 is when he called Ray to his office. Yeah. So it seems to me the record just doesn't play out. I mean, is the spring of 2014 early 2014, or is it middle 2014? You see what I'm saying, that the lack of clarity here. But in reality, what difference would it make? What? It makes a lot of difference if he doesn't know that she's reported him and he cuts her overtime, it might not be a retaliatory action. It might not be retaliatory. For retaliation, it's got to be retaliation. It has to be after. Oh, okay. On the retaliation claim, you're not on the tangible point of action. That's what I'm ... It's kind of a softball question, I think. I would acknowledge that the record does not give us pinpoint dates on when these ... We know it's happened about the same time. Well, we ... But, Your Honor ... Do we view the record at this stage in light what's favorable to you? Well, yes, which would ... Well, looking at it in that light, did the cutting of the overtime happen after he confronted her one-on-one? Well, respectfully, I would say that's not to trigger, Your Honor. It would be ... Okay. ... when he found out ... So, you're not going to answer my question? I can't give you a date, so here's the thing. You answered some other question. The case is here before us on a summary judgment motion, so we're required, like the district court was, to look at it in the light most favorable to you. Looking at the evidence in the light most favorable to you, can't we conclude that Ray called her into office and confronted her about the harassment and then cut her pay? Yes. Okay. But my ... That's what Judge Case was trying to ... That's exactly ... Okay. ... that's what I'm asking you. But ... Then you win the case. But the ... And the point is, when did he know she was complaining? Remember, she's complaining throughout, from 2013 on, she's complaining. Some ... They tipped her off at some point.  That's for the jury to determine at what point they tipped her off. Look at the facts now, as they appear on the record, if you like. You certainly agree that your sexual harassment claim is stronger than your retaliation claim. Are you speaking ... In terms of the ... In terms of the overtime? In terms of the precision of the timing. If you're speaking of the overtime, I would acknowledge that there are other aspects of the retaliation claim, such as the sabotage and the harassment, that you have witnesses saying, this is what he's doing. And then you have the lady that was the witness ... Yeah. No, I'm talking about ... Nadine. I'm talking about cutting the overtime. Yes, ma'am. Okay. Thank you, Mr. Murphy. Thank you. You've saved some time. Mr. Ramshaw? Yes, sir. Paul Ramshaw for the EEOC, as amicus, on behalf of the EEOC. I'm the plaintiff appellant. Since I'm focusing just on the harassment or the hostile environment claim and not the retaliation claim ... Very good. I'm not going to follow up on some of the factual questions we just talked about. But it's outrageous, I think, for the defendant, for the appellee, to say in his brief that there's no evidence that she complained between the first time she complained and September 2014. Because if you look at page 514 of the appendix, she says in one paragraph, I made my first complaint to ... I'm sorry, I'm forgetting the names, but to her immediate supervisor and the other two people. And then the next paragraph says, and then I complained repeatedly to my supervisor, told him I had to leave early because of how he was treating me and that he was treating me that way because I wasn't giving him some. And then the following paragraph says, and then in September 2014, I talked with Toubron and the HR people. When did she say, well, all right, I know I told you not to talk about, not to confront him about this, but now it's okay to confront him? Because initially she complained and ... There's no evidence that she said that, and I don't think she had to say that. I think you've got an employer with a policy that says there should not be any harassment. This is something we are not going to tolerate, okay? And in fact, the policy itself does not make an exception. So you're saying irrespective of the fact that she told Owens don't report it, Owens had a duty. Is that your position? I think ... No. Okay, well, what is your position? Our position is that if ... The employer's duty ... If a time ... Excuse me, let me finish. I'm sorry. As to the supervisor's duty at the time the employee says don't report it. What's the supervisor's duty at that point? It depends on ... The person who gets the complaint should try to figure out how severe the harassment allegedly was and whether other people were possibly subject to it. That would be important in deciding what ... And they should ask her, why don't you want us to do anything about it? And here she said it's because I'm afraid things will get worse. They should be able to assure her, no, things won't get worse. We will watch him. We will make sure ... Are you saying then that just as a matter of law, essentially, your claim is that then the supervisor had a duty to start the process irrespective of her comment? I'm saying it depends ... I'm saying that depends on the facts. If it's not very severe and no one else is being harmed and her embarrassment seems to ignore her request to keep it quiet, but when she comes back a number of other times and says this is still going on and she doesn't in those other times, as far as we know, they don't present evidence that in her subsequent complaints between the 1st and September 14, that she kept on saying don't do anything, don't do anything. At some point, they have to say, wow, okay, this ... They should then say, well, do you still want us to do nothing? And they should get more and more concerned about the fact that maybe they should do something in spite of her request that they do nothing, because this is continuing. Well, but don't the cases say that if she tells them to be quiet about it, that doesn't deprive the employer of the LRF fare, her defense? If in cases where there's only one complaint and a request to do nothing, sometimes the employer gets off, so I'm not saying ... I'm not sure I'm understanding your question. I'm sorry. Well, I think you answered it. The employer gets off if she tells them not to pursue the complaint or the employer could still assert the defense, the affirmative defense. But if she continues to complain and doesn't continue to say don't do anything, I think that makes the balance way different on the ... Let's see. Thank you, sir. Mr. Coleman. Good morning. Actually, good afternoon now. Good to have you here, sir. Your Honor, thank you. My name is Walker Coleman on behalf of the appellee here, and I'm here with my colleague Karen Spain, who will not be arguing today. Your Honor, you all hit on a major issue in this case, and I think part of it has to look at how the evidence that's in the record. In here, there is ... The record evidence shows that there was a one complaint on September 22nd of 2014 of sexual harassment. The record also shows, at most, that there was one other complaint to Mr. Owens and to others that you all addressed earlier, and that was in 2013. That is the complaint that Ms. Ray instructed Mr. Owens and others to not pursue. Under the Brown case, this court has found that that is reasonable. Here, almost all of the arguments that are made by the appellee are based on the testimony of Mrs. Ray. Almost all of the arguments that the appellant makes and the EEOC makes in this case are based on an unverified interrogatory responses, and also on her declaration that was submitted after the motion for summary judgment was filed. Well, that makes her case weak, perhaps, but why doesn't she get a chance to make the case as a matter of fact? Your Honor, and she does, but if you read carefully those interrogatory responses and the declaration, they aren't clear on when these multiple complaints occurred. Now, what her declaration actually says is that she made complaints over a three-year period, and the record evidence is consistent with that. She did, indeed, complain after her September 22nd complaint in 2014. She did complain about the staring and the manual loading of the documents. And that was afterwards, but in the record, there's only one other complaint prior to September 22nd, 2014, and that is the one complaint to Mr. Owens and Ms. Israel, where she instructed them not to pursue it. And, Your Honor, if you look at this, from more of a macro standpoint, you had Ms. Ray who worked there for 10 years. She admitted her deposition repeatedly that she understood the policy. She understood that there were multiple avenues that she could pursue to complain, and the company even had a 1-800 number and an anonymous hotline that Ms. Ray testified she even used to make an unrelated complaint. So notwithstanding her being fully aware of the policy, she waited for at least 10 years to complain. Okay, those are jury arguments. Well, Your Honor, but... Why is that a reason for us? How would you characterize her legal position? What you're saying is, this can't be that strong a case because, look, this lady was here for 10 years, she knew the policy, she didn't do anything. Well, that's all whether the jury wants to believe her, it seems to me. Sure, Your Honor. So with respect to the legal argument, when Ms. Ray finally availed herself after 10 years of the policy, it was investigated by HR, and it was investigated by HR. And it was investigated almost immediately after she reported it in September of 2014, which was the first complaint that she actually allowed to be investigated. And what was investigated was precisely, in the record, precisely what she told them. And as Your Honors know, in this circuit, the case law under Brown v. Perry, as well, is the employer is not required to be clairvoyant or omnipotent. They have to be a reasonable investigation. And the record evidence is that she, that the HR investigated what she told them. There was, the IP took, actually took remedial measures afterwards, and they basically instructed Mr. McDowell to not have any further contact with her. And they also changed her direct report. And by her own admission, importantly, by her own admission in her deposition, the sexual harassment stopped. It ceased. And so- Is that when he called her in and talked to her one-on-one? No, Your Honor, he called her in before, and I believe the court made a comment about that being a threat. I don't think that he threatened her. He just said, if you report me, I'm going to get in trouble, is all he said. Well, but doesn't that, that shows that he knew there had been a report. And then can, a jury could infer the things that happened to her after that were because of that. Well, Your Honor, I think that, I think that the fact that that was a report to Mr. McDowell, Ms. Ray knew, again, that the policy IP had multiple avenues through which she could report, you know, harassment, perceived harassment. And she also had the anonymous number that she could have called. And so, and so, and so I don't believe, I believe under the Dowdy and Caldwell cases, I do believe that in light of that, the fact that Mr. McDowell was put on notice as a supervisor of, of the harassment is, is, is not sufficient as a matter of law. Well, but it shows if he does something to her after that, a jury can infer that it's because it's because retaliation, right? Well, Your Honor, if with respect to, to whether it was retaliatory, if, if Mr. McDowell took any action after her that, you know, then, then that, that triggers the analysis of whether or not Ms. Ray can, can actually establish her promulgation case. And and as part of that, she, she, she, she has to be able to show that she suffered some adverse job consequences. Well, and after that, he cut her overtime. That's one way of looking at the record. Well, Your Honor, under the case law in the circuit, with respect to the overtime being cut, the, the, the, the law in this circuit usually looks to whether the, the, the, the appellant, the, the, the employee suffered, suffered any actual pecuniary loss. And here Ms. Ray testified throughout her, her, her deposition that she never, never suffered any pecuniary loss whatsoever. No, that's not what the record says. The record, you, you asked, you tried to get her to say that, or somebody tried to get her to say that in deposition, and then she corrected it by following up on that. That's not, the record does not say she suffered a pecuniary loss. Well, so, so Your Honor, and, and, and, and her, her, her deposition after, after repeatedly testifying that she did not suffer any financial loss, any cut in pay, any, any, any adverse consequence as a result of her, you know, complaining about harassment or, or, or not giving in to his, his, his, his advances. She then, then on, on, on cross-examination, Your Honor, you are correct, she, she was to her, did that affect your pay? To which she responded, yes, but she did not respond how it affected her pay. And I followed up after that, after that, and asked her. Well, when it affects your overtime, it doesn't make your pay go up. But, but, but, but Your Honor, the, the, her, the, the actual, what's in the, in the record evidence are, are her, her pay records, which actually show that she earned more overtime after she complained. Right, but there were two categories of overtime as shown by the record. There was voluntary overtime in the morning, and there was also mandatory overtime. And so the argument that she earned more in overtime does not speak to the issue whether she would have made more had she been, had the voluntary overtime been continued to be made available to her, does it? Well, Your Honor, with all due respect, I think that just, well, well, let's not get into the respect stuff. Tell me, doesn't the record draw a distinction between voluntary and mandatory overtime? And the voluntary overtime was, was coming in early in the morning, wasn't it? Yes, Your Honor. There were, as a... Okay. So she could have earned plenty of overtime in the afternoon so that she, so that the record didn't show that she suffered a, a diminution of the basket of overtime even when her voluntary overtime was zeroed out, right? Well, Your Honor, that's... That's not correct. I do not believe that's correct. Okay, tell me why. Yes, Your Honor. So, so, so you are, you are correct. There were, there were two ways of earning overtime in the record. There was to come in early before your shift and work voluntary overtime. Then, then if you, if the, if the subsequent shift worker was, was not there for whatever reason, called in sick, could not come in, then the company had a policy to work mandatory  You had to... Right. And there, and there's record evidence that Ms. Ray refused to work the mandatory overtime. And so, so, which, which placed the company in a bind because, because they had no coverage after that. And so, so, so that was when, when the, the company made the decision, if you can't work, work the, the mandatory overtime after a shift, because you, you have, have, have volunteered to come in early and work before your shift, the company can't be placed in that position, which is, which is a legitimate, non-discriminatory reason that the company articulated in response to the retaliation claim. And so, Your Honor, there's, there's nothing in the record that states that, that, that she asked to, to, to, to come in. I don't believe there's anything in the record that states that she asked to come in early and was denied that. And in fact, her, her, her pay records show that after complaining, she actually earned more overtime. And that's consistent with her testimony throughout her deposition. Volunteering more voluntary overtime as opposed to mandatory? It does not, and the record is not clear whether or not her, her earning more overtime, what was voluntary or mandatory. And that's my point. Okay. Yes, Your Honor. Um, so, so we turn to now, Your Honor, I'd like, I'd like just to make, make the point that, uh, that, that by looking, uh, again, if you, if you look at Ms. Ray's, at her deposition testimony, um, it, she, she, she, uh, she, she repeatedly stated, as I mentioned, uh, that she did not, that she did not suffer any, any, any adverse consequences as a result of, of, of refusing his advances or, or reporting, um, the, uh, the, the harassment. And so, and so I do, I do think there's nothing in the record that shows that, that Ms. Ray suffered any, any tangible employment action, therefore, uh, that the company gets the benefit of the affirmative defense. And, uh, and, and, and under prong one, um, uh, I think, I think that the company easily meets that, uh, because it had a policy in place, uh, it, it, uh, which, which, uh, which, which offered multiple avenues in which to, to report the harassment, even a 1-800 number. Um, and, uh, and, and Ms. Ray, when, when she, when she finally, uh, when she adhered to the policy, followed it and made her complaint, it wasn't, it was promptly investigated. The company took remedial measures and by her own admission, the sexual harassment stopped. So, uh, so I think, I think on the record evidence that, that prong one is met. I think with, with respect to prong two, I, I think, uh, and, and the, and the case law is, uh, is, you know, is, uh, is clear on this that, that, uh, that if an employee fails to utilize the company's complaint procedure, that, that, that normally is sufficient to establish the second prong. In, uh, in the Ellerth case, it was, it was only, only a nine-month, uh, delay. And in the Mapp-Via case, it was four months. In the McKinnish case, it was 10 months. Here we have at least 10 years. And so I think that the, that the second prong is met. So I do think that the, uh, the, the district court, we got it right on the sexual harassment. What about the issue of the employer's good faith administration of its policy? Um, if, if you have, you have evidence that the report that, um, they think she, that they think McDowell lied, uh, that they didn't take any action against McDowell. And then they ignored the coworkers at corroborating evidence that this man was lying to, um, is that a, is that a problem with the employer's good faith prong of Ellerth Farragher? In other words, whether they were in good faith administering it, or does the fact that they simply told him to stay away from her, does that conclusively establish their good faith for purposes of that prong? I think, Your Honor, for the purpose of that prong, I, I, I think the fact they, uh, that she admitted that the sexual harassment stopped, I think that's efficient. Um, and, uh, and, and finally, Your Honor, with respect to the retaliation, um, claims. The, uh, the, the, the, the appellant argues that, that the acts of, of, of retaliation are the overtime cut and the staring and the, uh, the manual, um, pushing of, uh, of documents on the line. With respect to the overtime, with respect to the overtime cut, um, there's, there, there's, there's no way you can screw that, that that was done because of her sex. And so I think that really is addressed, uh, under, under whether or not that was retaliatory. And uh, in here, uh, again, as, as I stated before, her testimony is very, very consistent here, uh, that, that she suffered no, no pecuniary harm or, or any other harm as a result of that. Uh, and, uh. That's not what she said in her deposition. She said in her deposition, page 411 or 12 of the trans, of the appendix, that she had suffered a loss. I guess it was you questioning her, but you asked her, it's a question to ask it, on 411 you say, uh, you didn't suffer any, uh, didn't cause, cause her to lose any money. Somebody said that. She says, no, you object, for whatever reason, you objected to that. And then on the next page, she, he says, well, did that affect your pay? And she says, yes, it did. But your Honor, and then, and then if you go beyond that, I asked her again because she said it affected her pay, but she didn't say how it affected it. I mean, it, it, it, it could have, it could have increased her pay or, you know, or cut in her overhead, cut in her overtime, increased her pay. We're talking about the, that was why, why, why I followed up with the question afterwards and I asked her again about that. So we construed that in a light most favorable to you? No, no, your Honor. Uh, I thought we construed it in a light most favorable to her, which would mean it would cut her pay. Well, your Honor, you, you absolutely do construe it in a light most favorable to her, but that was why, because that, that answer was not clear, I followed up right after that and her answer was no when asked about whether she suffered any, any pecuniary harm. With respect to the, to, to, to, to the staring, what Ms. Ray testified was that she believed that, that, that Mr. McDowell was, was staring at her and, and described it as dazed. And, and that, that, that's consistered, consistent with, with her prior testimony that, uh, that, that, that Mr. McDowell, one of his jobs was to make sure that the main line carrying these units, uh, was, was operating efficiently and, um, and, and, and moving smoothly. And Ms. Ray even described that, that line as being, um, two blocks long. So you could imagine if, if a part of your job is to, is, is to look down a conveyor belt that is two months long, I, I, you know, I can understand how, how a stare might be considered dazed. Mr., uh, uh, in, in her post, uh, summary judgment declaration, uh, that, that, that term was changed from dazed, uh, to, uh, to ogled and, uh, and, and, and, and the law is very clear that, uh, that, that if there's a conflict in testimony, uh, you can't change that the prior sworn testimony and a deposition by, by a subsequent, um, affidavit or declaration. And, uh, and so, and so, uh, and with respect to the, uh, uh, to the, the, um, the, what, what, what the appellant considers, you know, sabotage, which is the manual pushing of boxes. Um, there is no record evidence that either the dazed stare or, or the manual pushing of boxes was anything more than, than merely annoying to her. It didn't affect any term of her job or condition of her job. And so, uh, and so I think the, uh, the, the law in this circuit is clear on that as well, that, uh, that, that, that, that doesn't give rise to, to an adverse, um, you know, consequence. And so, uh, and so Ms. Ray is not, is not able to, uh, to establish her, her, her, her promophasia case. Um, the, uh, the, um, uh, the international paper, uh, uh, you know, gave it's, it's, it's, it's legitimate non-discriminatory reason. Uh, and, uh, and there, there is, is no evidence in the record that that's false or, or a pretext. And so, so therefore, I believe that the, uh, that the, the district court also got it right on the retaliation claim. Thank you. Thank you very much, sir. We appreciate it. Thank you, Your Honor. We'll, uh, oh, I'm sorry, we've got a rebuttal. I'm sorry. Yeah, Mr. Murphy, I apologize to you. I'd like to pick up on a couple of different issues. One on, uh, Judge Keenan's questions about the overtime. Uh, the other issue with the overtime was that the numbers that they put into the record, we, we submit support her claim that her overtime was cut in 2014. What they put in the record was that her overall overtime, which Judge Keenan was correct, has two components, increased in 2015 over 2014. I would suggest to you that shows it was lowered in 2014. Which is what we said. Uh, so it does not show, uh, that her overtime was not cut in 2014. In fact, their numbers would support. They never put into the record any, any, uh, anything to refute her claim that her, her daily overtime was cut. That's not in the record. Now, you think that would happen? They would have put that in. I would like to address, uh. Do you think she gets compensated for the 10 years she didn't complain about this fellow's? Yeah, I'm not sure she, I'm not sure she can go to the jury and say, give me compensatory damages for that 10 years. That wasn't. How far back does she get to go? That, that wasn't an issue we had addressed. I think I can say cleanly here without, uh, uh, without more research on that, that from the time she, she was complaining forward. I don't know the legal answer. So that's 2013 sometime in 2013? I believe so, Your Honor. But I don't know. I honestly don't know. That wasn't an issue. The scope of relief was not an issue we addressed on summary judgment. Um, I would like to address Brown if I could for one moment. What's the overtime rate? Uh, that, we put that in the briefing, Your Honor. I think it was 24. What is it? I think it's $24 an hour. Pardon? I believe $24 an hour. Is that time and a half? That's a time and a half, sir. So the regular rate, $16 an hour? I believe that's correct. All right. I believe that's correct. Um, this, this, this case is a, is a very interesting contrast to Brown. I mean, you think about what happened in Brown. That was, there was two incidents. Uh, they were on, uh, um, travel, uh, um, trips when, when Ms. Brown first complained and said she didn't want anything done. Her supervisor said, look, I support you 100%. Uh, whatever you want to do, we're here to back you. Now that's, that, that was the impetus between, uh, for, for this court's understandable recognition that when the employer does what you expect them to do under Title VII, then the employer can have the defense. And in most cases, that is what happens out there, uh, today. Most employers do act like that. Um, this is nothing like Brown. The second time that, uh, the lady in Brown complained, they reached an agreement with her. They, they sat down and met with her. Uh, there was a serious action taken. There was no action taken in this case. Uh, and, uh, the plaintiff actually had agreed with, uh, the measures that the employer took. That employer's actions understandably led to the result in Brown. But Brown doesn't create a doctrine for every case saying that because the employer did, because one fact in Brown happened in every other case where that one fact exists, you have to read Brown for the entirety of what happened in that case. Uh, and, and as this court held, it did an exemplary job of reassuring, uh, the accuser, taking whatever action was requested and, uh, what action was agreed upon. Here they claim they told him to stay away from her. Well, that's a big problem for them because they know he didn't. They know from, not just from my client's testimony, which is enough for summary judgment, but all the witnesses said he was coming around her. He was coming around her for no reason. In fact, named Dean Brown said it got worse after the September 14 complaint. Every time my client complained, her life got worse. And that's why I'm here. This employer can't avail itself of any defense. And even if it did, it'd be a mockery of the defense to find on these facts that this employer as a matter of law has met it. Because if this employer has met the L. R. Thurger defense as a matter of law, the title seven's over because there'd be hard, you'd be hard pressed to find a set of facts when the employer doesn't meet it. Also, Your Honor, it is not true that my, my, uh, client suggested that she was not sexually harassed after September 2014. In fact, it's undisputed in the record. She complained of sexual harassment after September of 2014. She never said she didn't suffer an actual pecuniary loss. She testified, as you pointed out, uh, that, that cut in overtime pay affected her. But remember, the questions were about the 20, September 2014 report. When he asked whether something was done after her, we briefed that. The cutting of overtime was back in the spring. Okay, so she was, you're talking about two completely different things. Um, as to the look, well, I see my time has expired. Thank you, Mr. Murphy. Thank you. We'll come down. We're going to adjourn for the day. Come down and greet counsel.
judges: Robert B. King, Barbara Milano Keenan, John A. Gibney Jr.